SHORTESS, Judge.
On October 1, 1990, the Louisiana Department of Public Safety and Corrections (DPSC)[1] issued an Invitation for Bid (ITB)[2] for the purchase of data processing hardware. Pacificorp Capital, Inc. (plaintiff) protested the solicitation, contending it was unduly restrictive and failed to invite competitive bidding. On November 30, 1990, the State’s chief procurement officer made a written declaration that awarding the contract was necessary without delay to protect the substantial interests of the State, thereby lifting the automatic stay imposed under Louisiana Revised Statute 39:1671(F). The only bidders on this contract were plaintiff and International Business Machines Corporation (IBM). When plaintiff was advised DPSC intended to award the contract to IBM, it formally protested the award. A hearing was held on the protests of both the bid and the award.
The hearing officer determined the bid specifications were not unduly restrictive and were based on what DPSC believed in good faith to be sound management and technical requirements. The hearing officer further found that IBM’s bid substantially complied with the ITB. Plaintiff appealed these findings to the Louisiana Commissioner of Administration, who affirmed the hearing officer. Plaintiff then appealed to the district court,[3] which held the hearing officer’s decision was rationally based and was not made arbitrarily or capriciously. Plaintiff now appeals to this court.
The standard of judicial review of this decision is set forth in Louisiana Revised Statute 49:964(G). That statute provides that the court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions; (2) in excess of the agency’s statutory authority; (3) made upon unlawful procedure; (4) affected by error of law; (5) arbitrary, capricious, or an abuse of discretion; or (6) manifestly erroneous.
PROTEST OF SOLICITATION
Plaintiff contends the trial court erred in affirming the hearing officer’s and Commissioner’s decisions that the specifications were not unduly restrictive. Plaintiff also contends the trial court erred in failing to consider certain proffered exhibits.
The hearing officer found DPSC’s specifications for “state-of-the-art” equipment were based on factors of compatibility, standardization, maintainability, and economy. We agree with the hearing officer’s *915 conclusion that such reasons are not arbitrary and capricious. Plaintiff contends, however, that Louisiana law requires specifications which encourage competition and are not unduly restrictive, citing Revised Statute 39:200(J) and Revised Statute 39:1655. Plaintiff maintains that a company like itself, which sells refurbished used equipment and new equipment which it purchases from manufacturers, cannot compete price-wise with a manufacturer like IBM who can sell directly to the end-user.
We believe the Louisiana Legislature, in requiring specifications which encourage competition, did not intend to force the State to accept less than state-of-the-art equipment simply because there is little or no competition for the equipment which best suits the State’s needs. We thus find the decision of the hearing officer regarding the specifications, as affirmed by the Commissioner of Administration and the trial court, was not legally incorrect, nor was it arbitrary and capricious.
We also find no error in the hearing officer’s refusal to admit letters from other companies similarly situated to plaintiff. The proffered letters state those companies did not bid because they could not compete price-wise with IBM on state-of-the-art equipment. Since we have held this is not a legal basis for rejecting the specifications, those letters have no relevance.
PROTEST OF AWARD
The Louisiana Procurement Code, Louisiana Revised Statutes 39:1551-1755, with certain named exceptions, applies to all expenditures of public funds under any contract for supplies, services, or major repairs, including the procurement of data processing equipment. LSA-R.S. 39:1554(B). Its application to the procurement of data processing equipment is implicit in the mandate of Revised Statute 39:200(M) which provides that statutory provisions which prescribe the procurement of data processing equipment (the Data Processing Procurement Code, Revised Statutes 39:196-200) supersede any conflicting provisions of the Louisiana Procurement Code. Pacificorp Capital, Inc. v. State, 604 So.2d 710 (La.App. 1st Cir.1992).
The Data Processing Procurement Code allows a vendor who conducts substantial business with the State over a period of time to file a master agreement with the state director of purchasing. LSA-R.S. 39:198(E). “Master agreement” is defined as “an agreement between the state and a vendor which specifies the general terms and conditions under which the parties will routinely conduct procurement business.” LSA-R.S. 39:197(9). Vendors may refer to the master agreement when responding to ITB’s, but such bid responses must include a proposed schedule incorporating the terms of the master agreement. LSA-R.S. 39:198(E)(2). However, master agreements may not be used to circumvent the competitive bid process. LSA-R.S. 39:198(E)(3).
The ITB in question herein provided at Section 1.4.4: “Bidder contracts, forms, or other materials and information not part of this bid must be submitted separately and clearly identified. If the bidder has previously negotiated, and the State has accepted a contract which would be suitable for this acquisition, it should be included for information purposes.”
IBM’s response to the ITB contains the following:
PART I
ADMINISTRATIVE SECTION
1.4.4 INCLUSION OF VENDOR FORMS, CONTRACT (etc.)
IBM and the State of Louisiana have a Master Agreement which is currently in effect and negotiated in accordance with La.R.S. 39:198(E). We have included one copy in Appendix A, of our original ITB response, and the terms and conditions of the following sections of Master Agreement 205-01 are offered for this procurement:
Composite Signature Agreement
Part (A) — Agreement for Purchase of IBM Machines
*916 Part (B) — IBM Maintenance of IBM Machines Section 1 — Corporate Service Amendment[4]
Plaintiff contends this language was intended to incorporate the referenced portions of the Master Agreement into IBM’s bid, thereby rendering IBM’s bid nonre-sponsive to the ITB. DPSC contends in brief that the reference to the Master Agreement in Section 1.4.4 of the bid is strictly for informational purposes and that “[t]he only portion of the agreement actually incorporated into IBM’s bid was in response to Section 1.4.9.”[5]
We note that Section 1.4.4 required materials being attached for informational purposes and not part of the bid to be “submitted separately and clearly identified.” However, the portions of the Master Agreement being “offered” by IBM were attached to the bid as Appendix A and contain nothing identifying them as strictly informational.
IBM does not contend in its brief that the reference to the Master Agreement in Section 1.4.4 was strictly for informational purposes; it admits IBM was “simply ‘offering’ and proposing a ‘schedule’ of those portions of the M[aster] Agreement] it thought appropriate for the procurement as required by [Revised Statute 39:] 198E(2).”
Based on testimony of representatives of IBM and DPSC, the hearing officer found there was “substantial compliance” with the requirements of the ITB because the terms of the Master Agreement which conflicted with the ITB were not required to be, and ultimately were not, incorporated into the contract. The hearing officer found that Section 2.2 of the ITB, which states that after determination of the lowest responsive and responsible bidder, the State will negotiate final contract terms, permits nonresponsive bids to the “non-mandatory” portions of the ITB. However, it is unclear in the ITB which sections are nonmandatory. Furthermore, it conflicts with the provisions of Revised Statute 39:200(G) which require the proposal or bid of the successful vendor to be incorporated into the final contract. It also conflicts with Section 1.8 of the ITB, which provides in pertinent part: “The contents of the bid of the successful bidder will become contractual obligations if a contract ensues.”
IBM’s Master Agreement contains a provision in the Composite Signature Agreement which states:
In those instances where IBM has submitted a written proposal or bid, the proposal or bid shall be incorporated into the final contract. Where such proposal is in response to an Invitation to Bid (ITB), the provisions of the ITB, subject to any change set forth in IBM’s proposal or bid, shall also be incorporated into the final contract. In the event of a conflict between the terms of the above Agreements and an ITB, the ITB, subject to the changes set forth in IBM’s proposal or bids, shall prevail. (Emphasis added.)
This provision implies that IBM can change the ITB. IBM states in brief that plaintiff was free to place a master agreement on file with the State and submit its own bid with nonresponsive terms to “nonmandato-ry” portions of the ITB. But how can the DPSC evaluate the bids and determine the lowest responsible and responsive bidder if the bidders are all submitting responses with differing terms?
Our comparison of the ITB with the portions of IBM’s Master Agreement “offered” with the bid shows many conflicts between those documents.[6]
*917 (1) Price Protection
Section 1.4.1 of the ITB requires: “ALL COST MUST BE FIRM FOR THE TERM.” However, Part B, Section VII, of the Master Agreement contains several provisions for increases in maintenance charges.[7] Furthermore, Part A, Section VII, of the Master Agreement states, subject to certain exceptions, that the “Purchase Price for each on-order Machine ... shall be subject to all price increases.” That section begins with the statement: “This Price Protection Period clause shall govern unless IBM has agreed to some other price protection provision in an ITB response or other agreement.” If IBM is “offering” these terms to DPSC, apparently IBM has not agreed to DPSC’s price protection provision in the ITB.
(2) Payment Date
Section 1.2 of the ITB basically provided the State wanted 90-day, no-interest financing; it requested delivery in January 1991 but stated no payment would be made and no interest would accrue prior to April 1, 1991. The Master Agreement, however, stated payment in full will be due on the date of installation. The fact that the State considered the Master Agreement to be part and parcel of IBM’s bid is evidenced by post-award negotiations which resulted in IBM agreeing to comply with the April 1 payment date.[8]
(3) Taxes
Page 2 of the ITB begins: “BIDDERS MUST COMPLY WITH ALL REQUIREMENTS ON THIS PAGE.” General Condition 3, found on that page, states in pertinent part: “The State is exempt from Federal Excise Taxes. Any other applicable taxes must be included in the bid price per item with the exception of sales and use taxes.” Section 1.4.1 of the ITB also provides: “Any taxes, other than STATE sales and use tax, will be assumed to be included within the bidders[’] cost.” Part A, Section I, of the Master Agreement provides, however: “The Purchase Price for each Machine ... does not include any applicable taxes.... ”

(4)New Versus Used Equipment

Page 2 of the ITB also states at General Condition 4: “Unless specifically called for in the I[T]B, all products for purchase must be new, never previously used, and the current model and/or packaging. No re-manufactured, demonstrator, used or irregular product will be considered for purchase unless otherwise specified in the IFB.” Part IV, Section 4.0, of the ITB states: “Group A equipment may be new or warranted as new. Groups B through F equipment must be new.” But the Master Agreement provides in Part A, Section X: “Machines purchased under this Agreement will be 1) newly manufactured by or for IBM from new and serviceable used parts which are equivalent to new in performance in these Machines, 2) assembled by or for IBM from serviceable used parts, 3) Machines which have been previously installed, or 4) Machines which are presently installed with the State.”
The hearing officer found that certain sections of the Master Agreement contained language which conflicted or departed from the requirements of the ITB. However, the hearing officer concluded: “IBM’s bid substantially complied with the requirements of the ITB in that the terms of the Master Agreement between IBM and the state which conflicted with the ITB were not required to be incorporated into a contract between the parties, and reference to the Master Agreement in the bid did not vary the requirements of the ITB.”
*918 Other than the date of payment, which was specifically changed to comply with the ITB, we find no evidence that the remainder of the terms of the Master Agreement was not incorporated into the contract, notwithstanding their conflict with the specifications of the ITB. The hearing officer was manifestly erroneous in finding IBM’s bid substantially complied with the ITB. We find IBM’s bid to be unresponsive to the ITB and reverse that portion of the judgment of the trial court affirming the award.
Plaintiff asks that if we reverse the award, we declare the contract null and void. Louisiana Revised Statutes 39:1676-1679 govern this court’s conduct once a finding is made that an award of a contract is in violation of law. Revised Statute 39:1678(1) provides that if the bidder has not acted fraudulently or in bad faith,[9] a contract awarded in violation of law may be either ratified and affirmed or terminated. This must be done at the administrative level. Revised Statute 39:1678.1 governs plaintiff’s damages; it limits them to the reasonable costs incurred in connection with the solicitation, including bid preparation costs other than attorney fees. We thus remand this ease to the district court to determine and assess any damages plaintiff may be entitled to under Revised Statute 39:1678.1. Alexander & Alexander, Inc. v. State, 596 So.2d 822, 829 (La.App. 1st Cir.1991), writ denied, 600 So.2d 641 (La.1992).
Costs of appeal in the amount of $290.91 are assessed to defendants, State of Louisiana, through the Division of Administration, Office of State Purchasing, and the Department of Public Safety and Corrections.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. DPSC may sometimes refer collectively to the Department of Public Safety and Corrections and the State of Louisiana, through the Division of Administration, Office of State Purchasing.

. "ITB” is the acronym used by the State to refer to an invitation for bid.

.International Business Machines Corporation intervened in the suit as an additional defendant.

. A total of 38 pages, letter-sized, single-spaced, in the Master Agreement are involved in the three sections "offered.”

. IBM’s response to Section 1.4.9 was as follows: IBM will offer the Patent and Copyright Indemnity terms contained in the current Master Agreement, between IBM and the State, 205-01, Part A, Agreement for Purchase of IBM Machines, Paragraph XIII, page A-14. DPSC maintains that Section 1.4.9 is a nonman-datory section of the bid and thus incorporation of the Master Agreement in that section does not render the bid nonresponsive. We agree.

.This is in no wise an exclusive list; we have simply used a few illustrations to show the problems we see with this bid.

. For example, one paragraph of Section VII includes this language: "Unless otherwise agreed, IBM may increase maintenance charges by providing the State three months’ written notice_ IBM’s hourly service rates, minimum charges for service time and all other charges are subject to change by IBM without notice.”

. DPSC introduced a Procurement Support Team Contractual Review form which states in pertinent part: "The letter from IBM dated 12/7/90 is hereby included in PST Record and provides for payment on 4/1/91 and not at the conclusion of performance test as stated in bid.”

. There is no evidence in the record, nor has plaintiff alleged, that IBM either acted fraudulently or was in bad faith.