647 So.2d 1122 (1994)
PACIFICORP CAPITAL, INC.
v.
STATE of Louisiana, Through the DIVISION OF ADMINISTRATION, OFFICE OF STATE PURCHASING.
92 CA 1729.
Court of Appeal of Louisiana, First Circuit.
August 11, 1994.
*1123 Anne J. Crochet, Baton Rouge, for plaintiff-appellant Pacificorp Capital, Inc.
Winston G. Decuir, Baton Rouge, for intervenor-appellant Delgado Community College.
Gordon Pugh, Baton Rouge, for defendant-appellee Intern. Business Machines Corp.
Kevin Torres, Baton Rouge, for defendant-appellee State.
Before LOTTINGER, C.J., and WATKINS, SHORTESS, CARTER, CRAIN, LeBLANC, FOIL, WHIPPLE, FOGG, PITCHER and PARRO, JJ.
*1124 FOGG, Judge.
This is an appeal by an aggrieved bidder who challenges an administrative agency's determination that a bid submitted by the lowest bidder on a public contract was responsive and also challenges the validity of the contract subsequently entered into by the successful bidder and the agency. The trial court affirmed the administrative rulings. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
The pertinent facts are not in dispute. On November 16, 1990, Delgado Community College (Delgado) issued an Invitation for Bid (ITB) for the purchase of computer equipment. An addendum to the ITB was issued by Delgado on December 4, 1990. Pacificorp Capital, Inc. (PCC) and International Business Machines Corporation (IBM) submitted bids to Delgado. The bids were opened on April 1, 1991. Delgado recommended IBM as the successful bidder. On April 12, 1991, a state procurement support team (PST) approved Delgado's selection of IBM as the successful bidder for the purchase of the computer equipment. By letter dated April 16, 1991, the Director of State Purchasing advised Delgado of the approval of Delgado's selection of IBM. On April 25, 1991, PCC invoked the administrative review provided for by La.R.S. 39:1671. It protested Delgado's evaluation of the bids and the intent of Delgado to award the bid to IBM on the basis that IBM's bid was not responsive to the ITB.
On May 2, 1991, before a hearing was scheduled on PCC's April 25 protest, Delgado and IBM executed an agreement for the purchase of the computer equipment. On May 15, 1991, PCC filed a protest of the May 2, 1991 action. An administrative hearing on both PCC's April 25, 1991 protest and its May 15, 1991 protest was held on July 16, 1991. By written decision dated October 11, 1991, the Hearing Officer denied both the April 25, 1991 protest and the May 15, 1991 protest.
PCC protested the Hearing Officer's October 11, 1991 determination to the Commissioner of Administration. The Commissioner denied the appeal of PCC, thereby affirming the Hearing Officer's decision. PCC then appealed the decision of the Commissioner to the Nineteenth Judicial District Court. The trial court affirmed the Commissioner's decision. From this ruling, PCC appeals.

ISSUES
PCC contends that IBM's bid and the subsequent contract are not responsive to the ITB. Specifically, PCC contends that IBM's bid response is nonresponsive to Sections 1.4.4, 1.4.8, 1.4.9, 1.5.3 and 3.2, and Part IV of the ITB. As to the contract ultimately entered into by Delgado and IBM, PCC urges that the contract resolution, the educational discount, and the end-user certification provisions, as well as the alleged ability of IBM to unilaterally change prices under the contract, render it unlawful.

DISCUSSION
Both the Data Processing Procurement Code, La.R.S. 39:196 et seq., and the Louisiana Procurement Code, La.R.S. 39:1551 et seq., apply to the procurement of data processing equipment and services; however, the Data Processing Procurement Code supersedes any conflicting statutory provisions of the Louisiana Procurement Code. La.R.S. 39:198 and 200M; Pacificorp Capital, Inc. v. State, 604 So.2d 710 (La.App. 1st Cir.1992).
The Data Processing Procurement Code provides that, except for small purchases and emergency situations, all procurement of computer hardware shall be by "competitive sealed bidding." La.R.S. 39:199. "Competitive sealed bidding" is defined therein as "a method of procurement which strictly follows the requirements set forth in Chapter 17 of Title 39 [which is the Louisiana Procurement Code] except for such variations as are specifically established herein." La.R.S. 39:197(6).
The Louisiana Procurement Code provides that competitive sealed bidding shall be initiated by the issuance of an invitation to bid containing all contractual terms and conditions applicable to the procurement, as well as the evaluation criteria to be used. La.R.S. *1125 39:1594B and E. A procurement support team assists the state in evaluating bids and negotiating the contract with the apparently successful bidder. La.R.S. 39:2001. The negotiation of contracts after the evaluation of bids is one of the primary differences between the procurement of data processing equipment and other procurement contracts subject to the Louisiana Procurement Code. Pacificorp Capital, Inc. v. State, 604 So.2d 710 (La.App. 1st Cir.1992).
The contract shall be awarded with reasonable promptness to the lowest responsive and responsible bidder whose bid meets the requirements and criteria set forth in the invitation for bids. La.R.S. 39:1594G. A "responsive bidder" is one who submitted a bid which conforms in all substantive respects to the invitation to bid. La.R.S. 39:1591(8). It is well settled that not every deviation between a bid invitation and a bid renders the bid nonresponsive; it is only when there is a substantial deviation that the bid must be rejected as nonresponsive. Where there is a deviation between the bid proposal and the bid which is considered insubstantial, there is valid competitive bidding, and contracts based thereon are not void. Bilongo v. Department of Health and Human Resources, 428 So.2d 1021 (La.App. 1st Cir.1983). The decision of whether or not a bid is responsive lies with the agency.
The standard of judicial review of a decision of the agency is set forth in La.R.S. 49:964G. That statute provides that the court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by error of law; (5) arbitrary, capricious, or an abuse of discretion; or (6) manifestly erroneous.
The manifest error test of La.R.S. 49:964G(6) is used in reviewing the facts as found by the administrative tribunal; the arbitrary and capricious test of La.R.S. 49:964G(5) is used in reviewing the administrative tribunal's conclusions and the exercise of discretion. Save Ourselves v. La. Environ. Cont. Com'n, 452 So.2d 1152 (La.1984). A conclusion of a public body is capricious when the conclusion has no substantial evidence to support it, or the conclusion is contrary to substantiated competent evidence. The word "arbitrary" implies a disregard of evidence or of the proper weight thereof. Coliseum Square Ass'n v. New Orleans, 544 So.2d 351 (La.1989). One purpose of so limiting the scope of review is to prevent the reviewing court from asserting the power delegated to the agency by the legislature. Buras v. Board of Trustees of Police Pension, 367 So.2d 849 (La.1979).

PROTEST OF THE AWARD
PCC insists that IBM's bid is nonresponsive to Sections 1.4.4, 1.4.8, 1.4.9, 1.5.3 and 3.2, and Part IV of the ITB. Sections 1.4.4, 1.4.8, 1.4.9 and 1.5.3 fall under Part I of the ITB which is designated as the "ADMINISTRATIVE SECTION." Some of the Administrative Section is designated as nonmandatory pursuant to Section 1.4, which is named "BID PREPARATION" and states: "Failure to comply with the following administrative requirements may be grounds, at the College's sole option, for rejection of the bid." The mandatory parts of the Administrative Section follow Section 1.5 which is designated "MANDATORY ADMINISTRATIVE REQUIREMENTS" and provides: "BIDS NOT CONFORMING TO THE FOLLOWING REQUIREMENTS WILL BE REJECTED WITHOUT FURTHER CONSIDERATION OR EVALUATION."
Section 1.4.4 of the ITB provides:
INCLUSION OF VENDOR FORMS, CONTRACTS, ETC.
Bidder contracts, forms, or other materials, and information not part of this bid must be submitted separately and clearly identified. If the bidder has previously negotiated, and the College has accepted a contract which would be suitable for this acquisition, it should be included for information purposes.
IBM's response to Section 1.4.4 provides:
IBM and the State have negotiated a Master Agreement in accordance with La.R.S. 39:198(E). We have included one copy in *1126 our original ITB in Appendix A. The terms and conditions of the following sections of Master Agreement 205-01 currently in effect between IBM and The State of Louisiana are offered for this procurement:
Composite Signature Agreement
Part (A)Agreement for Purchase of IBM Machines
Part (B)Maintenance of IBM Machines
The terms and conditions of any applicable Volume Procurement Agreement will also apply to the discount if indicated in the Cost Section.
PCC insists that IBM's bid is nonresponsive to Section 1.4.4 of the ITB because it included and incorporated terms and conditions of IBM's Master Agreement which deviate substantially from the bid specification. Specifically, PCC contends that, by declaring that two provisions of the Master Agreement "are offered for this procurement" and that "any applicable Volume Procurement Agreement will also apply," IBM's bid response included and incorporated those terms and conditions of the Master Agreement. It argues that since the bid response includes those provisions, and because the procurement law mandates that an agency unconditionally reject a bid or accept it without alteration or correction, acceptance of IBM's bid by Delgado constitutes an acceptance of Sections A and B and the Volume Procurement Agreement of the Master Agreement. It argues there was thus a change in IBM's bid response and such is not allowed under the Procurement Law.
The Hearing Officer concluded that this section was permissive, rather than mandatory, and that IBM's responses did not substantially deviate from the requirements of the ITB. In support of the Hearing Officer's decision, the Division of Administration argues in essence that the references to the Master Agreement did not constitute a substantial variation from the ITB because the references to the Master Agreement were for informational purposes only and were not a mandatory part of the IBM bid response. The Division of Administration further contends IBM was complying both with the ITB and the Data Processing Procurement Law.
We find no error in the administrative interpretations regarding IBM's use of the Master Agreement as providing information only, as requested, and not as a mandatory part of the bid response. We note that Section 1.4.4 is clearly located in the part of the administrative section that is discretionary. Furthermore, pursuant to Section 198E of the Data Processing Procurement Law, IBM was allowed to refer to the Master Agreement in its bid. Pursuant to La.R.S. 39:198E(3) the state director of purchasing, subject to the approval of the commissioner of administration, retained the sole authority to determine whether or not to accept those terms and conditions in awarding the contract. Thus, considering the nonmandatory nature of the section involved, the fact that the Data Processing Procurement Law allowed IBM to refer to its Master Agreement and to reference those sections which would be specifically applicable to the procurement at issue, and because the state, not IBM, had the sole authority to determine whether those provisions were suitable to the contract at issue, it was reasonable for the agency to conclude that IBM's inclusion of those terms and conditions of its Master Agreement in its bid did not render the bid nonresponsive.
In the case of Pacificorp Capital v. State, 620 So.2d 913 (La.App. 1st Cir.), writ denied, 629 So.2d 351 (La.1993), this court considered an ITB issued by the Louisiana Department of Public Safety and Corrections for the purchase of data processing hardware. Therein only IBM and PCC bid on the contract. IBM prevailed and litigation ensued. In that case, this court considered the issue of whether IBM's response to Section 1.4.4 of the ITB rendered its bid nonresponsive. The language of Section 1.4.4 of the ITB and IBM's response was essentially the same as that in the present case. This court found that the Hearing Officer was manifestly wrong in finding IBM's bid substantially complied with the ITB; found that IBM's bid was nonresponsive to the ITB; and reversed the award of the contract to IBM. Upon further consideration of this issue, for the reasons discussed above, we believe we *1127 erred in that decision. Accordingly, the decision of Pacificorp Capital v. State, 620 So.2d 913 (La.App. 1st Cir.), writ denied, 629 So.2d 351 (La.1993) is overruled.
Section 1.4.8 of the ITB provides:
PATENT AND OTHER PROPRIETARY RIGHT INDEMNITY
Contractor warrants that all materials and/or products produced hereunder will not infringe upon or violate any patent, copyright, trade secret, or other proprietary right of any third party. In the event of any claim by any third party against the College, College shall promptly notify Contractor after becoming aware of such a claim and Contractor shall defend such claim, in College's name, but at Contractor's expense and shall indemnify and hold harmless College against any loss, expense, or liability arising out of such claim, whether or not such claim is successful.
The College agrees to fully cooperate with the Contractor in the defense of any such action and recognizes that Contractor shall have full control of any defense of settlement of the claim.
IBM responded as follows:
IBM will offer the Patent and Copyright Indemnity terms contained in the current Master Agreement, between IBM and the State, 205-01, Part A, Agreement for Purchase of IBM Machines, Paragraph XIII, page A-14.
PCC contends that IBM's bid places obligations on Delgado which are not contained in the ITB. Specifically, PCC contends IBM's language addresses only defense of patent and copyright infringement claims and does not address trade secret or other proprietary rights as does Section 1.4.8 of the ITB.
Section 1.4.8 is another nonmandatory portion of the ITB. For the reasons given in our discussion of Section 1.4.4 of the ITB, we find no error in the agency's conclusion that IBM's bid was responsive to this section of the ITB. We find support for this conclusion in the case of Pacificorp Capital v. State, 620 So.2d 913 (La.App. 1st Cir.), writ denied (La.1993), which we are herein overruling on other grounds. In that case, IBM's response to this section (which was designated in the ITB in that case as Section 1.4.9) was identical to IBM's response in the present case. In resolving the issue of responsiveness, we stated: "[The agency] maintains that Section 1.4.9 is a nonmandatory section of the bid and thus incorporation of the Master Agreement in that section does not render the bid nonresponsive." We agree.
Section 1.4.9 of the ITB provides:
All contracts for equipment will include stipulation that the vendor will make a reasonable effort to replace any equipment destroyed by disaster with the next available machine except that the Department of Defense will have priority over the College's requirement.
IBM's response to this section of the ITB provides:
IBM offers the following clarification to this section for the State's consideration:
In the event of fire, flood, or other major disasters, IBM's practice is to provide, as available, and in conformance with Legal restrictions, a system approximating the user's configuration when the IBM equipment becomes inoperable for a prolonged period. IBM's current price will apply to any system so provided.
PCC once again contends that the differences between the ITB and IBM's response are substantial deviations. As to this nonmandatory portion of the ITB, the record does not support the contention that the agency was arbitrary or capricious in determining that "a comparison of the two provisions reveals that there is no `substantial' deviation between the ITB and IBM's response."
PCC further contends that IBM's statement that its bid would expire on June 30, 1991, unless IBM extended the offer, is a substantial deviation from Section 1.5.3 of the ITB which provides that "[a]ll bids will be considered valid for a period of ninety (90) days," because IBM, not Delgado, has defined the time in which its bid can be considered valid.
The Hearing Officer noted that IBM's bid was submitted on April 1, 1991 and provided *1128 that it would remain in effect through June 30, 1991, a period in excess of the required ninety days. The Hearing Officer found the extension of the offer beyond the required ninety days was not a substantial deviation from this mandatory section of the ITB. We agree and conclude that this aspect of the bid response did not render the IBM bid nonresponsive.
PCC's further contends that IBM's response to Section 3.2 of the ITB is nonresponsive. This section falls under Part III of the ITB, which is entitled "EQUIPMENT, SPECIFICATIONS AND REQUIREMENTS SECTION." Sections 3.1 and 3.2 of that part provide:
3.1 TECHNICAL SPECIFICATIONS
Bidders are cautioned that all stated requirements are mandatory.
3.2 SCOPE
This specification establishes the hardware, features, maintenance support and other technical requirements for the data processing equipment to be delivered on or before________. Bidders are cautioned that all stated requirements are mandatory.
IBM responded to Section 3.2 as follows:
IBM has placed equipment on-order with a current Estimated Schedule Date of May 31, 1991, to meet the desired delivery date. Final details of installation and operation of equipment will be negotiated during final contract negotiations.
The Hearing Officer disposed of this issue as follows:
... Section 3.2 of the ITB does not require any delivery date, but leaves the delivery date blank, as does Page 1 of the ITB, the instruction page. Both Pacifi-Corp and IBM recognized this omission from the ITB and sent letters to Delgado requesting clarification of the required delivery date. Delgado responded to the inquiries by stating: "The desired delivery date is thirty (30) days after receipt of order."
In resolving the first protest to the ITB filed by PacifiCorp, this Officer previously held that Delgado's response to the letters of inquiry respecting the desired delivery date did not constitute an addendum to the ITB. As a result, the ITB, as issued, is silent with respect to the delivery date. Pursuant to Louisiana Civil Code Article 1778, a reasonable term for delivery is implied.
In responding to Section 3.2 of the ITB, IBM stated that it "has placed equipment on-order with a current Estimated Schedule Day of May 31, 1991 to meet the desired delivery date." PacifiCorp alleges that this language is not responsive because it does not state that IBM will deliver the equipment thirty days after it receives Delgado's order. However, as explained previously, the ITB, as issued contains no requirement for delivery within thirty days. The delivery schedule proposed by IBM is reasonable, and given the fact that the purchase order in this procurement was issued on May 2, it actually comports with the thirty-day schedule desired by Delgado.
For the reasons articulated by the Hearing Officer, we find the agency's determination, that IBM's response was not a substantial deviation, was neither arbitrary nor capricious and conclude that this aspect of the bid response did not render the IBM bid nonresponsive.
PCC's final attack of IBM's bid on the grounds of nonresponsiveness concerns Part IV, Sections 4.1-4.6 of the ITB, which provide for the standard of performance for the equipment. Section 4.1 of the ITB states that "[a]ll equipment may be subject to the standard of performance stated below." In response to letter inquiries by both PCC and IBM, Delgado explained that "[e]xact terms [of Part IV] are not mandatory, and can be clarified and mutually agreed to during contract negotiations." In response IBM offered its own standard of performance criteria, which was prefaced as follows:
If Delgado Community College requires a Standard of Performance period, IBM offers the following criteria, or criteria as mutually agreed to, for such period[.]
We find that the determination by the agency, that IBM's response to Part IV of *1129 the ITB was responsive, was not arbitrary or capricious.
THE VALIDITY OF THE CONTRACT
PCC challenges the validity of the May 2, 1991 contract between IBM and Delgado on the grounds that the contract incorporates Master Agreement 205-01-A which contains provisions that conflict with the ITB and provisions that impose additional requirements on Delgado not set forth in the ITB. Further, PCC alleges that the contract, in a supplement, provides for the unilateral change in price by IBM, contrary to the ITB.
The contract between IBM and Delgado is comprised of the Master Agreement, a Supplement, the ITB and IBM's proposal. The Supplement contains the following provision:
Notwithstanding any other provisions to the contrary in the Master Agreement (205-01-A), in the event of any conflict between the ITB, the IBM bid response and this contract, the ITB shall prevail, then IBM's bid response, then the contract.
The Hearing Officer found that this provision is clear and unambiguous and explains how any potential conflict between the ITB and the Master Agreement will be resolved. Pursuant to this provision, a conflict between the terms of the Master Agreement and the ITB, the ITB controls, thereby negating any conflict.
The Hearing Officer further found that this result is not altered by the inclusion of a slightly different conflict resolution clause in the composite signature portion of the Master Agreement, because the conflict resolution clause of the Supplement, a very particular conflict resolution clause applicable to this specific procurement, overrides, by its terms, the conflict resolution provision in the composite signature portion of the Master Agreement: "Notwithstanding any other provisions to the contrary in the Master Agreement...." In these conclusions, we find no error on behalf of the agency.
PCC contends that the educational and volume procurement discounts and the end-user certification provisions of the Master Agreement impose additional requirements on Delgado not set forth in the ITB, and thereby constitute substantial deviations from the requirements of the ITB.
The Master Agreement makes an educational discount available to Delgado, but to obtain this discount Delgado must agree to use the purchased equipment for internal purposes. If it transfers the equipment to a non-educational institution, it may be required to pay back a portion of the discount. Because the ITB does not specifically provide for the imposition of such conditions on Delgado, PCC alleges that the inclusion of these conditions on the Master Agreement amounts to a deviation from the ITB which renders IBM's bid nonresponsive and mandates voiding the contract.
The Hearing Officer found this contention to be without merit for three reasons: (1) the testimony at the hearing of the matter clearly established that IBM's bid was the lowest bid, with or without the educational discount and the volume discounts; (2) the State is at liberty, pursuant to La.R.S. 39:198E(3), to accept or reject that portion of the Master Agreement relative to educational and volume discounts; and (3) in accepting, or agreeing to take advantage of the educational and volume discounts offered through the Master Agreement, Delgado was not agreeing to the imposition of any conditions which substantially limit its use or enjoyment of the equipment. In other words, none of the conditions imposed on Delgado upon receipt of the discounts constituted substantial deviations from the requirements of the ITB, sufficient to render IBM's bid nonresponsive and to warrant avoiding the contract. We find no abuse of discretion in the determination that the educational and volume discounts do not substantially deviate from the ITB and no error of law in their inclusion in the contract.
The end-user certification requires Delgado to certify that it is purchasing the IBM equipment for use within its own business enterprise and not for remarketing. PCC contends the imposition of such a certification on Delgado allows IBM to control Delgado's use of the equipment in a manner not contemplated by the ITB, rendering the May 2 contract void.
*1130 The Hearing Officer rejected this argument, finding that Delgado was not allowing IBM to control its ability to use and dispose of the IBM equipment, but rather it is simply certifying that it is not purchasing the equipment to turn around and resell it. The Hearing Officer reasoned that while the ITB does not contemplate an end-user certification in the May 2 contract, its inclusion in that contract does not render the contract null, because it does not represent a substantial deviation from the ITB.
We agree that the end-user certification simply represents Delgado's intent not to buy the machinery and turn around and sell it. There is no abuse of discretion in the determination that the end-user certification does not represent a substantial deviation from the ITB and no error of law in its inclusion in the contract.
PCC further complains that paragraph 1 of the Supplement impermissibly gives IBM the unilateral authority to change the contract price. That paragraph provides: "prices for purchase of installed Machines may be changed by IBM up to and including the Effective Date of Purchase (which must be within the Quotation Month), subject to any limitations described in any other applicable IBM agreement."
The Hearing Officer found that that provision did not apply to this procurement and, therefore, was not properly the subject of complaint. We agree. An examination of the Supplement reveals that Paragraph 1 refers to "Installed Machines" (machines that have been previously installed on a lease/purchase basis). Paragraph 2 of the Supplement indicates that this procurement involves only "on-order" machines. Therefore, this complaint lacks merit.

CONCLUSION
For the foregoing reasons, we find that the agency correctly determined that IBM's bid was responsive to the ITB and that the contract entered into by IBM and Delgado for the purchase of computer hardware is valid. Accordingly, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Pacificorp Capital, Inc.
AFFIRMED.
LeBLANC, J., concurs in result.
SHORTESS, J., dissents and will assign reasons.
WHIPPLE and PARRO, JJ., dissent for the reasons assigned by SHORTESS, J.
SHORTESS and WHIPPLE, Judges, dissenting.
IBM's contract with Delgado incorporates the Master Agreement, which contains many terms and conditions which substantially deviate from the Invitation to Bid (ITB), thereby rendering it nonresponsive. The following are a few examples:
(1) Part I of the ITB requires costs to be firm for the term of the contract, while Part B, Section VII, of the Master Agreement allows IBM to increase maintenance charges and Part A, Section VII, allows IBM to increase the purchase price.
(2) Part I of the ITB requires taxes to be included in the bid. Part A, Section I, of the Master Agreement provides, however, that the bid price does not include taxes.
(3) Part III, Section 3.5, of the ITB requires new or "warrantied as new" equipment. Part A, Section X, of the Master Agreement permits IBM to provide used machines.
(4) Part IV, Section 4.6, of the ITB provides that payment shall not be made until the performance standard has been met, which requires, under Part IV, Section 4.2, at least a 30-day trial after installation. However, Part A, Section 1, of the Master Agreement provides that payment is due on the date of installation.
The majority agrees with the hearing officer that the ITB controls in the case of a conflict between it and the Master Agreement, citing the conflicts resolution clause contained in the contract supplement. The majority ignores the fact that the supplement was executed 13 days after the contract was complete and was never considered by Delgado in determining whether *1131 to accept IBM's bid.[1] A nonresponsive bid cannot be made responsive by an after-the-fact alteration of the bid response. LSA-R.S. 39:1594(G).
In our opinion, the hearing officer committed legal error in concluding the conflicts resolution clause in the supplemental contract rendered the conflicts complained of by Pacificorp to be "not conflicts at all." Those conflicts were substantial and thus IBM's bid was nonresponsive to the ITB. We would remand the case to the district court to determine and assess any damages to which Pacificorp may be entitled. Further, a decision should be made at the administrative level whether to ratify and affirm the contract or to terminate it. LSA-R.S. 39:1678.1.
We respectfully dissent.
NOTES
[1] On April 16, 1991, the Director of State Purchasing advised David Nicklas of Delgado that the Procurement Support Team had reviewed and recommended approval of Nicklas' selection of IBM as the successful bidder. The letter further stated: "No further action is required by the Office of State Purchasing. Upon the issuance of your purchase order this project will be considered completed." The purchase order is dated April 19, 1991. The supplemental contract is dated May 2, 1991.